UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

ISAAC SPRUILL,                                    :    __ Civ. __

                                                 :

                    Plaintiff,                    :    **COMPLAINT WITH JURY**

                                                 :    **DEMAND**

        -against-                                 :

                                                 :

ELEGANTE SERVICES INC., NEW ELEGANTE              :

CAR SERVICE, INC., RICARDO OQUENDO,               :

ANGELA PRATTS, and JOSE VILOIRA,                  :

                                                 :

                    Defendants.                   :

------------------------------------------------------------------- X

Plaintiff, Isaac Spruill, by his attorneys, Law Office of Andrea Paparella, PLLC, alleges as follows:

## NATURE OF THIS ACTION

1.      Mr. Spruill brings this action under Title VII of the Civil Rights Act of 1964 ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"); the Americans with Disabilities Act of 1990 ("ADA"); the Fair Labor Standards Act ("FLSA); the New York Labor Law ("NYLL"); New York State Executive Law §§ 296 et seq. ("New York State Human Rights Law"); and the Administrative Code of the City of New York §§ 8-101 et seq. ("New York City Human Rights Law").

2.      Mr. Spruill claims that Defendants Elegante Services Inc., New Elegante Car Service, Inc., Ricardo Oquendo, Angela Pratts, and Jose Viloira discriminated against him on the basis of his race and disability and retaliated against him for complaining of such discrimination.

3.      Mr. Spruill further claims that Defendants failed to pay him overtime, did not pay him for all hours worked, and frequently paid him late. When Mr. Spruill complained, Defendants retaliated against him by, among other things, continuing to discriminate against Mr. Spruill and ultimately terminating his employment.

**JURISDICTION AND VENUE**

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

5.      On August 25, 2016, Mr. Spruill filed a Charge of Discrimination with the Equal Opportunity Employment Commission (the "EEOC"), complaining that Elegante's conduct violated Title VII and the ADA, in addition to other laws.

6.      The EEOC issued a Notice of Right to Sue, dated March 31, 2017, which is attached as Exhibit A.

7.      Venue is appropriate in the Southern District of New York because, pursuant to 28 U.S.C. § 1391(b), a substantial part of the acts or omissions giving rise to the claims occurred in this District.

**THE PARTIES**

8.      Mr. Spruill is a 41-year-old African-American male.

9.      From January 30, 2015 to October 30, 2015, Mr. Spruill was employed as a driver by Elegante Services Inc. and New Elegante Car Services, Inc. d/b/a Elegante Transportation ("Elegante").

10.     Throughout his employment with Elegante, Mr. Spruill was well-qualified for his position and performed his duties in a professional and competent manner.

11.     Defendant Elegante Services Inc. ("Elegante Services") operates in New York State as a New York Domestic Business Corporation, where it was incorporated in February of 2012.

12.     Elegante Services, at all relevant times, operate out of its base office at 1804 Randall Avenue, Bronx, New York 10473 and a nearby office 1904 Lacombe Avenue, Bronx New York.

13.     Elegante Services offers non-emergency medical transportation ("N-EMT") to patients traveling to and from medical appointments who need extra assistance because of a medical condition. Elegante Services transports these patients in special-purpose vehicles equipped to carry wheelchairs or otherwise accommodate such disabled persons, which are staffed with two-men teams,

a driver and his helper. Elegante uses two types of vehicles to transport patients requiring such assistance, ambulettes and a "buggy." Ambulettes are specially-equipped vans that can carry two or three wheelchair patients, while a "buggy" is a car equipped to carry a single wheelchair patient, and much smaller.

14. Elegante Services also provides N-EMT to patients who do not need special assistance, such as shuttle services to and from nursing homes and rehab centers and private livery car services.

15. Elegante Services is a for-profit company, which receives most, if not all its income from insurance companies, which include both private insurers and government health care programs, such as Medicaid and Medicaid.

16. What would be Elegante Services began providing assisted N-EMT prior to its incorporation, in or before 2011, when it only serviced Brooklyn.

17. While Elegante Services assisted NEMT remains local, it now transports patients in its ambulettes and "buggy" within the borders of all five boroughs of New York City.

18. Defendant New Elegante Car Service, Inc. ("Elegante Car") is a New York Domestic Business Corporation, incorporated in New York State in May 1993.

19. Elegante Car is also based out of 1804 Randall Avenue, Bronx, New York 10473 and has offices at 1904 Lacombe Avenue in the Bronx, New York, where it operates with Elegante Services under the same d/b/a name "Elegante Transportation Services."

20. Elegante Car is a for-profit livery car service, which provides general ground transportation to passengers within all five boroughs of New York City, dispatching vehicles from Queens, Brooklyn and Manhattan along with those dispatched from the Bronx.

21. Defendant Jose "Vito" Viloria, a Dominican man, is, upon information and belief, a resident of the Bronx, New York. Mr. Viloria is the President of Operations of Elegante.

22. Mr. Vito works out of the Elegante's Bronx headquarters office and is the top on-the-scene executive managing Elegante's employees.

23. Defendant Angela Pratts, a Hispanic woman, is Mr. Viloria's spouse and, upon

3

information and belief, a resident of the Bronx, New York. Ms. Pratt is the Chief Executive Officer of Elegante.

24.     Defendant Ricardo Oquendo, a Puerto Rican man, upon information and belief, is a resident of the Bronx, New York.  Upon information and belief, Mr. Oquendo served as Elegante's Operations Manager throughout March 2011 to July 2015 and was the Operations Manager of Elegante Car in 2015.

25.     Mr. Oquendo too worked out of Elegante's Bronx headquarters, where he was the direct manager of all Elegante's employees. Mr. Oquendo was the most senior executive on the scene after Mr. Viloria.

## FACTS

### Defendants Were Mr. Spruill's Employers

#### *Elegante Services And Elegante Car Are An Integrated, Single Employer*

26.     Elegante Services and Elegante Car are an integrated, single employer, both working under the d/b/a name Elegante Transportation ("Elegante").

27.     For example, Elegante Services and Elegante Car have interrelated operations, centralized control of labor relations, common management and common ownership or financial control.

28.     Indeed, their operations are centralized and headquartered at the same office in the Bronx and, upon information and belief, during the relevant time through today Ms. Pratts sits as the CEO and Mr. Viloria as the President of Operations of Elegante. In addition, during the relevant time, Mr. Oquendo served as upper management of Elegante, serving as the Manger of Operations.

#### *Elegante Services and Elegante Car Are Joint Employers*

29.     Elegante Services and Elegante Car are likewise joint employers.

30.     For instance, Elegante Services and Elegante Car share the same website, do business

4

under the same name, and have overlapping upper management and executives who share supervisory authority over both groups of Elegante.

31.     Moreover, Elegante Services and Elegante Car share resources, including their headquarters office, main telephone number, and primary email address contact address.

32.     Additionally, the executives at have the power to hire and fire employees in either group, determine pay and manage payroll, among other things.

### *Mr. Viloria, Ms. Pratts, And Mr. Oquendo Were Mr. Spruill's Employers Under The FLSA And The NYLL.*

33.     Mr. Viloria, Ms. Pratts, and Mr. Oquendo were Mr. Spruill's "employers" for purposes of the FLSA and the NYLL as they were acting as such within the course and scope of the employer-employee relationship at all relevant times.

34.     Mr. Viloria, Ms. Pratts, and Mr. Oquendo always exercised sufficient control of Elegante Services' operations to be covered employers pursuant to the FLSA and the NYLL.

35.     Mr. Viloria, Ms. Pratts, and Mr. Oquendo directly managed Elegante's day-to-day operations.

36.     Indeed, Mr. Viloria, Ms. Pratts, and Mr. Oquendo possessed the authority to hire and fire employees; implemented and supervised employees' work schedules; set employee pay rates; devised, directed, implemented and supervise Elegante's wage and hour practices affecting Elegante's employees, and were responsible for maintaining employee records, including payroll records.

37.     At all relevant times, Mr. Viloria, Ms. Pratts, and Mr. Oquendo acted on Elegante's behalf and consented to, ratified, and authorized Elegante's acts alleged herein.

## FACTS

### Overview Of Elegante's Ambulette Service

38.     The majority of Elegante's ambulettes had two people assigned to them: a driver

5

and a helper. Drivers received the schedule of patients to pick up and transport. Drivers also received calls for unscheduled patients that requested an ambulette. The helper's job was to assist the driver in getting patients in and out of the ambulette.

39.     Elegante had a main office where the administrative and managerial staff worked. This included the managers and the dispatchers. Each manager oversaw different areas of the ambulette business. The dispatchers called the drivers and helpers and gave them assignments.

40.     A "two-man job" was an assignment that required two men to carry a client in and out of her home to the ambulette because of the client's weight or because her home had stairs.

41.     Elegante told the drivers and helpers that its policy was not to assign two-man jobs if the client lived above the third floor.

42.     However, Elegante constantly violated its own policy and assigned two-man jobs for patients that lived above the third floor.

**On January 30, 2015, Mr. Spruill Began Working At Elegante As A Driver.**

43.     On January 30, 2015, Mr. Spruill began working at Elegante as a driver.

44.     Mr. Spruill was employed through his friend, Koreem Washington, an African-American male who was a road supervisor at Elegante at the time.

45.     On his first day, Elegante assigned a van to Mr. Spruill without providing him any kind of training.

46.     Elegante did not ask Mr. Spruill to fill out any paperwork or get any certification, and no one checked to see if Mr. Spruill had the proper driver's license.

47.     Elegante paid Mr. Spruill $10.50 an hour "off the books."

48.     When Mr. Spruill first started work, Elegante told Mr. Spruill that it would pay him on the book after three months; however, Elegante never put Mr. Spruill on the books.

49.     Mr. Spruill was scheduled to work the evening shift, from 3:00 p.m. to 9:00 p.m., although he usually stayed until 10:00 p.m. or later.

50.     Elegante did not give Mr. Spruill any breaks, including any breaks to use the restroom.

51.     Elegante did not give Mr. Spruill any breaks even when he worked a 12-hour shift.

**Elegante Did Not Pay Mr. Spruill Overtime, Constantly Paid Mr. Spruill Late, And Did Not Pay Mr. Srpuill For All Hours Worked.**

52.     Although Mr. Spruill worked overtime almost every day, Elegante never paid Mr. Spruill any overtime for his overtime hours.

53.     When Mr. Spruill started working, Elegante told Mr. Spruill that he would receive checks every week; however, Elegante constantly paid Mr. Spruill late.

54.     Mr. Spruill often complained to Elegante's management about the lack of overtime pay, but Elegante did not take any action.

55.     When Elegante did pay Mr. Spruill, it often did not pay Mr. Spruill the full amount he was entitled to.

56.     When Mr. Spruill complained about the discrepancy in his pay, Elegante would tell Mr. Spruill that it would make up the difference by paying him extra on his next check.

57.     The next paycheck, Elegante would pay Mr. Spruill a little more, but still not enough to cover what it owed him.

58.     Elegante used to do this only to its African-American employees. Upon information and belief, Elegante's Hispanic employees were paid the correct amount regularly.

**Elegante Discriminated Against Its African-American Employees By Only Hiring Hispanic Employees To Work In The Office And Assigning Most Of The Two-Man Jobs To African-American Employees.**

59.     Throughout Mr. Spruill's employment, Elegante gave its Hispanic employees preferential treatment while discriminating against its African-American employees.

60.     Elegante's office staff consisted of entirely Hispanic employees. No African-American employees were allowed to work in the office.

7

61. In contrast, the African-American employees could only work as drivers and helpers.

62. Mr. Spruill tried to stay away from the office as much as possible because he felt unwelcome because he was not Hispanic. For example, whenever Mr. Spruill went into the office, all the office employees would switch from speaking freely in English to speaking exclusively in Spanish.

63. In addition, upon information and belief, Elegante primarily assigned the two-man jobs to its African-American drivers and helpers.

64. If a Hispanic driver or helper had a two-man job on his schedule, he could get his schedule changed and pass the assignment off to the African-American drivers and helpers.

65. If a Hispanic driver or helper received a call for a two-man job and complained, Elegante would accommodate the Hispanic driver or helper by reassigning the two-man job to an African-American driver or helper.

66. If Mr. Spruill or another African-American driver tried to refuse a two-man job, Elegante would say they were not allowed to refuse the job. Elegante would also threaten to fire Mr. Spruill or another African-American drivers if they did not take the two-man jobs.

67. In fact, Mr. Spruill's shift supervisor, Ana Destrepo, specifically told Mr. Spruill that he could not refuse any calls.

68. Elegante's pattern of assigning more work to the African-American drivers and helpers and giving them more of the two-man jobs continued throughout the duration of Mr. Spruill's employment.

**In March 2015, Mr. Spruill Complained Of Discrimination To Mr. Viloria, Elegante's President Of Operations.**

69. In March 2015, Mr. Spruill met with Elegante's President of Operations, Mr. Viloria, who is a Hispanic male.

70. During their conversation, Mr. Spruill complained of Elegante's preferential

treatment of its Hispanic employees to Mr. Viloria. As an example, Mr. Spruill pointed out that there were only Hispanic employees working in the office.

71. Mr. Viloria conceded that there were only Hispanic employees in the office but told Mr. Spruill that it was because he needed bilingual speakers.

72. Upon information and belief, however, many of the office employees either would not or could not speak any English to Elegante's clients. In fact, many of Elegante's clients complained because the office employees only spoke Spanish to them.

73. Upon information and belief, Mr. Viloria did not have a legitimate business reason for only allowing Hispanic employees to work in the office, which illustrated Mr. Viloria's preferential treatment towards Hispanic employees, compared to the African-American employees.

74. In addition to racial discrimination, Mr. Spruill also complained of Elegante's failure to pay overtime pay to Mr. Viloria.

75. Mr. Viloria simply confirmed that Elegante paid employees their regular pay for all overtime hours worked.

**On October 30, 2015, Mr. Spruill Was Injured On The Job And Elegante Refused To Accommodate His Disability.**

76. On October 30, 2015, when Mr. Spruill arrived at the lot to get an ambulette, there was no helper available to ride with him that day.

77. Mr. Spruill told the lot supervisor Mike, who was Hispanic, that he could not do any two-man jobs because he did not have a helper.

78. That afternoon, Mr. Spruill received a call from dispatch with an assignment to pick up a client from her medical appointment and take her to her home in Yonkers.

79. When Mr. Spruill arrived, he realized that he had had this patient before. She was a wheelchair patient and lived in a house with stairs. As soon as Mr. Spruill realized that this was a two-man job, Mr. Spruill called dispatch and asked them to send him backup.

9

80.     Dispatch assured Mr. Spruill that they would send a helper to meet him if he called when he arrived at the client's home.

81.     Once Mr. Spruill arrived at the client's home, he called dispatch back and told them he needed assistance to bring the client up the stairs of her home.

82.     However, Mr. Spruill received no response. Mr. Spruill called dispatch six or seven times. Mr. Spruill was finally connected on the last attempt, but was placed on hold for about half an hour. As Mr. Spruill waited, the client grew increasingly angry about the delay. Dispatch finally told Mr. Spruill that he had to find a way to get her up the stairs somehow and hung the phone up on him.

83.     No one was supposed to do two-man jobs by themselves.

84.     Upon information and belief, no Hispanic driver was ever assigned a two-man job when he was by himself.

85.     In general, Elegante hardly ever assigned two-man jobs to Hispanic drivers. When Hispanic drivers did receive two-man jobs, the office usually accommodated them if they wanted to switch assignments.

86.     Upon information and belief, Elegante not only assigned Mr. Spruill a two-man job when he was by himself, which was against Elegante's work protocol, but also intentionally refused to send Mr. Spruill assistance because he is African-American.

87.     Even though Mr. Spruill had several other clients scheduled afterwards, he could not leave the patient.

88.     Elegante had repeatedly told employees that they had to deliver a client to her home before employees could leave an assignment. Elegante used to threaten to fire employees if we did not deliver the client back to her home.

89.     Once Mr. Spruill knew dispatch would not send him any help, Mr. Spruill had no choice but to bring the client into her home by himself, even though he knew it was not a good idea to lift her by himself.

90.     While trying to life the client up the stairs, Mr. Spruill pulled a back muscle. After

10

he left the client's home and was driving on the highway, Mr. Spruill suddenly felt a tremendous pain in his back, as if his back was on fire.

91. Mr. Spruill pulled over to the side of the road, called the office, and said he had injured himself. He explained that he was going to call an ambulance. Elegante's only response was to ask Mr. Spruill what he was going to do with the van.

92. Even though Mr. Spruill was in immense pain, he told Elegante that he would try to return the van back to the lot.

93. Mr. Spruill then called Mike, who was supervising the lot. Mr. Spruill said he would try to return the van to the lot, but that he needed Mike to call an ambulance for when he arrived at the lot. Mr. Spruill asked if Mike could send anyone out to pick him up, but Mike said that was not possible. Mike promised that when Mr. Spruill arrives at the lot, he would have an ambulance waiting for Mr. Spruill and would document his injury.

94. In contrast to Mike's assurances, however, Mike had not called the ambulance when Mr. Spruill arrived at the lot. Mike also did not document Mr. Spruill's injury.

95. In fact, Mr. Spruill had to call an ambulance himself. Subsequently, Mr. Spruill was taken to the Jacobi Medical Center.

96. The doctor told Mr. Spruill that he had pulled a muscle in his back. The doctor then advised Mr. Spruill to avoid any strenuous work, especially anything involving lifting something up.

97. The next day, Mr. Spruill had to see a physical therapist, who told him that he had to be out of work for at least three to four weeks.

98. Mr. Spruill informed Elegante about his injury and the doctor's recommendation not to work. In response, Elegante told Mr. Spruill it was not firing him and that he should take his time to get better.

**Three Months After Mr. Spruill Had Become Disabled, Elegante Terminated Mr. Spruill's Employment.**

99.     After approximately three months, Mr. Spruill was able to recover from his injury and return to work.

100.    In approximately January 2016, Mr. Spruill returned to Elegante, ready to resume his job.

101.    Once Mr. Spruill returned to work, however, Elegante said it had assigned all the vans and did not have a job for him, constructively terminating Mr. Spruill's employment.

## FIRST CLAIM
### Race Discrimination And Retaliation In Violation Of Title VII
(Against Elegante)

102.    Mr. Spruill repeats and realleges the allegations contained above as if separately set forth herein.

103.    At all relevant times. Mr. Spruill was an "employee" of Elegante under Title VII, 42 U.S.C. § 2000e(f).

104.    Elegante is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

105.    By its actions described above, Elegante has unlawfully discriminated against Mr. Spruill on the basis of his race and retaliated against Mr. Spruill for complaining of such discrimination in violation of Title VII.

106.    As a result of Elegante's discriminatory and retaliatory conduct, Mr. Spruill has suffered substantial damages, including emotional pain and mental anguish, in an amount to be determined at trial.

107.    Upon information and belief, Elegante's discriminatory conduct was engaged with malice and/or reckless indifference to Mr. Spruill's rights. Mr. Spruill is therefore entitled to punitive damages under Title VII.

## SECOND CLAIM
### Race Discrimination And Retaliation In Violation Of Section 1981
(Against Defendants)

108.    Mr. Spruill repeats and realleges the allegations contained above as if separately set forth herein.

109.    By their actions detailed above, Defendants unlawfully discriminated against Mr. Spruill on the basis of his race and retaliated against him for complaining of such discrimination in violation of Section 1981.

110.    As a result of the discrimination and retaliation described above, Mr. Spruill has suffered substantial loss of earning and benefits, and he will continue to do so in the future. Accordingly, Defendants are liable to Mr. Spruill for, among other things, back pay, damages for emotional distress, attorneys' fees and costs, interest, and punitive damages.

## THIRD CLAIM
### Discrimination And Retaliation In Violation Of The ADA
(Against Defendants)

111.    Mr. Spruill repeats and realleges the allegations contained above as if separately set forth herein.

112.    Defendants' failure to reasonably accommodate Mr. Spruill's disability constituted unlawful intentional discrimination against Mr. Spruill in violation of the ADA, 42 U.S.C. § 12112(b)(5)(A).

113.    As a result of Defendants' discriminatory and retaliatory conduct, Mr. Spruill has suffered substantial damages, including lost past and future wages, emotional pain and mental anguish, and attorneys' fees and costs in an amount to be determined at trial.

114.    Upon information and belief, Defendants' discriminatory conduct was engaged with malice and/or reckless indifference to Mr. Spruill's rights under the ADA. Mr. Spruill is therefore entitled to punitive damages under the ADA.

## FOURTH CLAIM
### Violation Of The FLSA
**(Against Defendants)**

115.    Mr. Spruill repeats and realleges the allegations contained above as if separately set forth herein.

116.    Mr. Spruill is an employee and Defendants are employers under the FLSA, 29 U.S.C. § 203.

117.    Defendants' policies and practice of suffering, permitting and demanding Mr. Spruill work long hours resulted in Mr. Spruill working substantial overtime, for which Defendants failed to pay him at the legally-required overtime premium pay of time and a-half the hourly rate of pay for all time worked exceeding 40 hours in a workweek. 29 U.S.C. § 207.

118.    In addition, Mr. Spruill engaged in protected activity when he complained about his pay. Upon information and belief, there is a causal link between Elegante's continued discrimination against Mr. Spruill and eventually terminating his employment and Mr. Spruill's assertion of his rights under the FLSA.

119.    Due to Defendants' violation of the FLSA, Mr. Spruill is entitled to recover his unpaid overtime pay, owed pay, liquidated damages as provided by the FLSA for overtime violations, attorneys' fees and costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

120.    Defendants' conduct described above also constitutes willful violation of the FLSA.

## FIFTH CLAIM
### Violation Of The NYLL
**(Against Defendants)**

121.    Mr. Spruill repeats and realleges the allegations contained above as if separately set forth herein.

122.    Defendants violated the NYLL by, among other things, paying Mr. Spruill "off the books" and retaining a substantial portion of Mr. Spruill's earned overtime pay.

123.    In addition, Mr. Spruill engaged in protected activity when he complained about his pay. Upon information and belief, there is a causal link between Elegante's continued discrimination against Mr. Spruill and eventually terminating his employment and Mr. Spruill's assertion of his rights under the NYLL.

124.    Due to Defendants' NYLL violations, Mr. Spruill is entitled to recover, among other things, unpaid wages and overtime premium pay, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action.

**SIXTH CLAIM**
**Race And Disability Discrimination And Retaliation**
**In Violation Of The New York State Human Rights Law**
**(Against Elegante For Race and Disability Discrimination And Retaliation, And**
**Against Mr. Viloria, Ms. Pratts, And Mr. Oquendo For Aiding And Abetting)**

125.    Mr. Spruill repeats and realleges the allegations contained above as if separately set forth herein.

126.    By its actions detailed above, Elegante unlawfully discriminated against Mr. Spruill on the basis of his race and disability and retaliated against Mr. Spruill for complaining of such discrimination in violation of the New York State Human Rights Law.

127.    Mr. Viloria's, Ms. Pratts's, and Mr. Oquendo's actions set forth above also violated § 296(6), which sets forth that:

> It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.

128.    Upon information and belief, Defendants' conduct towards Mr. Spruill constitutes willful discrimination.

129.    As a result of the willful discrimination and retaliation described above, Mr. Spruill has suffered substantial loss of earnings and benefits and will continue to do so in the future. Accordingly, Defendants are liable to Mr. Spruill for both back pay and reinstatement or front pay in

15

lieu of reinstatement in an amount to be determined at trial, mental and emotional anguish, plus interest and costs.

**SEVENTH CLAIM**
**Race And Disability Discrimination**
**In Violation Of The New York City Human Rights Law**
**(Against Defendants)**

130.    Mr. Spruill repeats and realleges the allegations contained above as if separately set forth herein.

131.    Mr. Spruill is a "person" under the New York City Human Rights Law, § 8-102(1).

132.    Defendants are an "employer or an employee or agent thereof" under the New York City Human Rights Law, § 8-102(5) and § 8-107(1)(a).

133.    By their actions detailed above, Defendants have unlawfully discriminated against Mr. Spruill on the basis of race and disability and retaliation in violation of the New York City Human Rights Law.

134.    In addition, Mr. Spruill opposed Defendants' unlawful, discriminatory employment practices and engaged in protected activity under the New York City Human Rights Law. In response, Defendants retaliated against Mr. Spruill for having engaged in protected activity.

135.    As a result of Defendants' unlawful conduct, Mr. Spruill has suffered and continues to suffer substantial damages. Accordingly, Defendants are liable to Mr. Spruill for back pay and reinstatement or front pay in lieu of reinstatement, other employment benefits, and damages for emotional pain, attorneys' fees and costs, and mental anguish in amounts to be determined at trial.

136.    Defendants' discriminatory conduct was taken with reckless indifference to Mr. Spruill's rights, entitling her to punitive damages under the New York City Human Rights Law.

16

**EIGHTH CLAIM**
**Aiding And Abetting In Violation Of**
**The New York City Human Rights Law**
**(Against Defendants)**

137.    Mr. Spruill repeats and realleges the allegations contained above as if separately set forth herein.

138.    Defendants' actions set forth above violated § 8-107(6), which sets forth that:

> It shall be unlawful discriminatory practice for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests this Court:

A.    Accept jurisdiction over this matter;

B.    Award Plaintiff unpaid wages and an equal amount in liquidated damages as provide for by the FLSA, 29 U.S.C. §§ 201, et seq.

C.    Award Plaintiff unpaid wages and an equal amount in liquidated damages as provided for by the NYLL;

D.    Issue an injunction requiring Defendants to pay all statutorily-required wages;

E.    Order Defendants to compensate Plaintiff for his past and future lost wages and benefits;

F.    Enter a judgment in favor of Plaintiff for such amount as may be awarded by a jury for compensatory damages, including, without limitation, for his physical and emotional suffering;

G.    Enter a judgment in favor of Plaintiff for such amount as may be awarded by a jury for punitive damages;

H.    Enter a judgment awarding Plaintiff all costs and reasonable attorneys' fees;

I.    Enter a judgment awarding Plaintiff all pre- and post-judgment interest;

J.    Enjoin Defendants from engaging in unlawful discriminatory practices; and

17

K.     Grant such other further legal and equitable relief as this Court deems just and proper.

Dated: New York, New York
       July 5, 2017

Law Office of Andrea Paparella, PLLC

By:  ___/s/ Andrea M. Paparella___

Andrea M. Paparella
Siobhan Klassen
150 W. 28th Street, Suite 1603
New York, New York 10001
Telephone: (212) 675-2523
Facsimile: (914) 462-3287
Email: ap@andreapaparella.com
        sk@andreapaparella.com

*Attorneys for Plaintiff*